**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| DAMIRE GLADDEN-MARTIN | : | |
| 143 W Main St. # FL 2ND | : | |
| Bloomsburg, PA 17055 | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | CASE NO.: 4:26-CV-00781 |
| | : | |
| v. | : | **JURY TRIAL DEMANDED** |
| | : | |
| ARCONIC CORPORATION | : | |
| 555 Guthridge Ct. | : | |
| Norcross, GA 30092 | : | |
| and | : | |
| KAWNEER COMPANY INC. | : | |
| 555 Guthridge Ct. | : | |
| Norcross, GA 30092 | : | |
| And | : | |
| AEROTEK, INC. | : | |
| 7301 Parkway Dr. | : | |
| Hanover MD 21076 | : | |
| | : | |
| Defendants. | : | |
| | : | |

**CIVIL ACTION COMPLAINT**

Damire Gladden-Martin, (hereinafter referred to as "Plaintiff," unless indicated otherwise), by and through his undersigned counsel, hereby avers as follows:

**INTRODUCTION**

1.     This action has been initiated by Plaintiff against the Arconic Corporation, Kawneer Company Inc., and Aerotek, Inc., (hereinafter collectively referred to as "Defendants," unless indicated otherwise) for violations of Title VII of the Civil Rights Act of 1964 ("Title VII – 42 U.S.C. §§ 2000d et. seq.), Section 1981 of the Civil Rights Act of 1866 ("Section 1981" – 42

1

U.S.C. § 1981), and the Pennsylvania Human Relations Act ("PHRA"). As a direct consequence of Defendants' unlawful actions, Plaintiff seeks damages as set forth herein.

**JURISDICTION AND VENUE**

2.      This action is being initiated pursuant to federal laws and therefore, the United States District Court for the Middle District of Pennsylvania has original subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the claims arise under the laws of the United States.

3.      This Court may properly maintain personal jurisdiction over Defendants because its contacts with this state and this judicial district are sufficient for the exercise of jurisdiction over Defendants to comply with traditional notions of fair play and substantial justice, satisfying the standard set forth by the United States Supreme Court in *Int'l Shoe Co. v. Washington,* 326 U.S. 310 (1945), and its progeny.

4.      Pursuant to 28 U.S.C. § 1391(b)(1) and (b)(2), venue is properly laid in this district because Defendants are deemed to reside where it is subjected to personal jurisdiction, rendering Defendants residents of the Middle District of Pennsylvania.

5.      Venue is further appropriate in this District as Defendants employed Plaintiff at Defendant Kawneer's Bloomsburg facility, located at 500 East 12th Street, Bloomsburg Pennsylvania 17815.

6.      Plaintiff filed a Charge of discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") and also dual-filed said charge with the Pennsylvania Human Relations Commission ("PHRC").  Plaintiff has properly exhausted his administrative proceedings before initiating this action by timely filing and dual-filing his Charge

with the EEOC and PHRC, and by filing the instant lawsuit within 90 days of receiving a right-to-sue letter from the EEOC.

7.    Plaintiff has properly exhausted his administrative remedies regarding his PHRA claims by dual-filing his Charge of Discrimination with the Pennsylvania Human Relations Commission ("PHRC") and by waiting at least one year since the filing before asserting his PHRA claims.

**PARTIES**

8.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

9.    Plaintiff is an adult individual, with an address as set forth in the caption.

10.    Defendant Arconic Corporation is an American industrial company specializing in lightweight metals engineering and manufacturing.

11.    Defendant Kawneer Company Inc. is a subsidiary of Defendant Arconic that designs and produces architectural aluminum systems used in commercial buildings and has a plant located in Bloomsburg, Pennsylvania (where Plaintiff physically worked).

12.    Because of their interrelation of operations, common ownership or management, centralized control of labor relations, common financial controls, and other factors, Defendant Arconic and Defendant Kawneer (hereinafter collectively referred to as "Defendant AK") are sufficiently interrelated and integrated in their activities, labor relations, ownership, and management that they may be treated as a single and/or joint employer for purposes of the instant action.

13.    Defendant Aerotek is a staffing and recruiting company with a location at the above-captioned address.

14.     Plaintiff was placed by Defendant Aerotek to work within Defendant AK.

15.     Although Plaintiff was hired and paid through Defendant Aerotek, he was treated in all functional respects like an employee while working within Defendant AK.

16.     Defendants' management had the ability to manage Plaintiff, give directive to Plaintiff, and make decisions regarding Plaintiff's employment. Plaintiff was permitted to address his work concerns with Defendants' management and was obligated to follow the rules and policies of all Defendants.

17.     For the foregoing reasons, Defendants may be treated as a single and/or joint employer for purposes of the instant action.

18.     At all times relevant herein, Defendants acted by and through their agents, servants and employees, each of whom acted at all times relevant herein in the course and scope of their employment with and for Defendants.

### FACTUAL BACKGROUND

19.     The foregoing paragraphs are incorporated herein in their entirety as if set for in full.

20.     Plaintiff is a Black (African America) male.

21.     Plaintiff was hired through and paid by Defendant Aerotek, but was placed to work for Defendant AK, on or about October 29, 2024.

22.     Defendant AK's management directly oversaw Plaintiff, including the terms and conditions of his employment/assignment and had authority to hire, fire (end his assignment), and issue him discipline.

4

23. During the course of his employment with Defendants, Plaintiff was a hard-working employee, who performed his job well and was not subjected to a history of progressive discipline.

24. Plaintiff was primarily supervised by Scott Laubaugh (Caucasian – hereinafter "Laubaugh").

25. Defendants placed Plaintiff on a 90-day probationary period, which included a performance and disciplinary evaluation review by Laubaugh.

26. Plaintiff consistently demonstrated a strong work ethic and performed his job duties diligently and with a high level of competence.

27. For example, but not intending to be exhausted, during the aforementioned probationary period and as the completion of Plaintiff's 90-day probationary period was approaching, specifically less than a week before Plaintiff's termination on or about December 19, 2024 (discussed further *infra*), Finishing Manager (Laubaugh's direct supervisor) – Gerald Campbell (Caucasian – hereinafter "Campbell") told Plaintiff of Defendant AK's ***intent to hire Plaintiff full-time***.

28. From the onset of Plaintiff's placement at AK, there was a significant disparity in the ratio of employees, with noticeably fewer Black employees compared to Caucasian employees.

29. Throughout Plaintiff's employment with Defendants, he was subjected to disparate and discriminatory treatment because of his race, as outlined in the examples below.

30. As part of their onboarding process, Defendant AK required direct supervisors to designate personnel to train newly hired employees in their respective departments.

31. When Plaintiff started, he was not given the required training despite asking Laubaugh repeatedly, who was responsible for such designation of training.

32. However, when new Caucasian employees were hired, Plaintiff observed that training was promptly provided to them in line with Defendant AK's standard practice.

33. Rather than designate someone to train Plaintiff, Defendant AK attempted to have newly hired Caucasian employees, who had less experience with Defendant AK than Plaintiff did, train Plaintiff instead or they had Plaintiff train the new hires, even though Plaintiff himself was not provided the necessary training.

34. For Plaintiff's 30-day evaluation, which Laubaugh postponed *without reason* until what should have been Plaintiff's 60-day evaluation, Plaintiff was given lesser score ("twos") because "that is how we do it here."

35. Upon information and belief, Laubaugh gave Defendant AK's production tech Dylan (Caucasian – last name unknown – "Dylan"), who was hired after Plaintiff, "threes, just because."

36. Despite performing better or at the same level as Dylan, Dylan received a higher score, without justification or distinction, other than the difference in skin color between Plaintiff and Dylan.

37. On several occasions, Defendant AK's own employees explicitly warned Plaintiff about the racial bias that existed within Defendants' organization.

38. Statements such as: "the supervisors are racist," "they (referring to management) had a pattern of *getting rid of colored employees*," "don't give them a reason," and "they will sweep it under the rug" (referring to any complaints made about the aforesaid racial discrimination), are only a few of the comments that were made to Plaintiff by other employees about Defendant AK's racial animosity.

39.    Upon information and belief, approximately five (5) non-White employees were terminated prior to the beginning of Plaintiff's employment, further underscoring a pattern of racial inequity and targeting.

40.    On multiple occasions, several of Defendant AK's Caucasian employees, including Keagen Smith (Caucasian – hereinafter "Smith"), made deeply offensive and racially charged remarks that perpetuated harmful stereotypes and reinforced a toxic, racially hostile environment.

41.    For instance, they made comments such as "get back on the *plantation*," a blatant reference to the atrocities of slavery and pointed to something black while looking at Plaintiff saying, "it's *like looking in a mirror*."

42.    During a conversation about an upcoming family gathering, Smith further perpetuated racial stereotypes by asking whether Plaintiff was "bringing the fried chicken and Kool-Aid," a comment **steeped** in racial bias and stereotypes. Upon information and belief, Smith has a history of making racial remarks in the workplace but continues to be employed with Defendant AK.

43.    The same or similar observations and concerns regarding racial discriminatory and disparate treatment have been corroborated by Union President, Douglas Heard (Black/African American – hereinafter "Heard"), who expressed that non-White employees were treated differently within Defendants. *See* Witness Statement of Douglas Heard, attached hereto as "Exhibit A."

44.    By way of example only, Heard has confirmed the following:

   a.  Caucasian employees have made discriminatory and derogatory comments about other Black employees or Black people in general and have not been terminated for

7

the same (despite escalating concerns of this discriminatory behavior to Human Resources);

b. Non-White employees of Defendants were treated in a disparate manner compared to Caucasian employees with regard to terminations and disciplinary decisions.

c. Employees of Defendants, including himself, have been subjected to retaliation for complaining of racial discrimination.

d. Non-White employees were consistently terminated for manufactured reasons, which did not warrant termination.

45.    By way of further example Justin Musselman (Caucasian – hereinafter "Musselman") has also confirmed that he observed disparate treatment between minority employees and Caucasian employees, including terminating minority employees for selectively enforced or unwarranted reasons while allowing Caucasian employees with history of discipline to remain employed." *See* Witness Statement of Justin Musselman attached hereto as "Exhibit B."

46.    In response to the aforementioned ongoing racially charged work environment, that was evidently worsening, Plaintiff complained of racial discrimination to Defendant AK's management, including Laubaugh.

47.    However, rather than addressing Plaintiff's aforementioned concerns with the seriousness they warranted by conducting a proper investigation, Plaintiff was met with dismissive comments such as "that is just the *world we live in*," and "it's ***just a joke***; don't take it so seriously."

48.    On or about December 17, 2024, an incident occurred where production tech, Issac Billigs (Caucasian – hereinafter "Billigs"), became extremely hostile towards Plaintiff, making discriminatory comments to him such as "be a *good son* and do your *job boy*."[1]

---

[1] The use of "boy," when directed at a Black man, carries deep-rooted racial connotations, historically used to demean and belittle Black individuals (particularly during the era of slavery and segregation).

49. Billigs' aforementioned behavior towards Plaintiff culminated as he, entirely unprovoked, became violent towards Plaintiff and attempted to swing and hit Plaintiff with a metal pole.

50. While Plaintiff moved to avoid being hit by Billigs with a metal pole, he did not react or engage in confrontation; rather, Plaintiff immediately notified management, including Laubaugh, of Billigs' hostile behavior.

51. In response, Laubaugh praised Plaintiff for doing the right thing and not reacting, and expressed that for "safety reasons, we have to walk both you guys out and will see you next week."

52. Thereafter, Plaintiff questioned Laubaugh whether he was being suspended and was told "I need you to leave for today, *you are good*, you have a witness and you did not react."

53. Moreover, on or about December 18, 2024, Plaintiff received a call from Human Resources ("HR") – Andrew Knipfer (Caucasian - hereinafter "Knipfer"), for a statement about the aforesaid incident, and Plaintiff provided the same.

54. To Plaintiff's surprise, on or about December 19, 2024, he was informed by Knipfer that he was being terminated and told "long story short we're letting you both go."

55. The aforementioned decision was made, even though Plaintiff had a witness who confirmed that he did not provoke anything and that Plaintiff did not react when being threatened and degraded by Billigs.

56. When Plaintiff attempted to clarify the reason for his aforementioned termination and advocate for his position, no additional explanation was provided.

57. Defendant Aerotek was aware of the aforesaid racial discrimination and complaints regarding the same, prior to his removal from the assignment with Defendant AK.

58. Upon information and belief, Defendant AK continued to employ several Caucasian employees with a documented history of progressive disciplinary problems.

59. In **stark** contrast, Plaintiff had no prior history of disciplinary issues, did not instigate or provoke the aggressor, and followed Defendants' policies by promptly reporting the incident and the discriminatory remarks to Defendants' management.

60. Despite adhering to company protocols, Plaintiff was terminated shortly after engaging in protected activity by complaining about the racially charged treatment he experienced as a member of his protected class.

61. Following Plaintiff's removal from Defendant AK, Defendant Aerotek did not make any effort to find Plaintiff alternative employment, despite his inquiries regarding the same.

62. Plaintiff therefore believes and avers that he was terminated from Defendants in violation of Title VII and Section 1981 for discriminatory and retaliatory reasons.

### COUNT I
### Violations of Title VII of the Civil Rights Act of 1964 ("Title VII")
### ([1] Race Discrimination; [2] Hostile Work Environment; [3] Retaliation)
### -Against All Defendants-

63. The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

64. During Plaintiff's employment with Defendants, he was subjected to a hostile work environment through disparate and discriminatory treatment because of his race and/or for engaging in protected activity under Title VII.

65. Plaintiff was abruptly terminated under false and pretextual circumstances as discussed herein on or about December 19, 2024.

66. Plaintiff believes and therefore avers that his race was a motivating or determinative factor in Defendants' decision to terminate his employment.

67.    Plaintiff also believes and avers that he was terminated in retaliation for engaging in protected activity under Title VII.

68.    These actions constitute discrimination under Title VII.

### COUNT II
### Violations of 42 U.S.C. Section 1981
### ([1] Race Discrimination; [2] Hostile Work Environment; [3] Retaliation)
### -Against All Defendants-

69.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

70.    During Plaintiff's employment with Defendants, he was subjected to discrimination through disparate treatment because of his race.

71.    Plaintiff was abruptly terminated under false and pretextual circumstances as discussed herein on or about December 19, 2024.

72.    Plaintiff believes and avers that he was terminated because of his race and/or in retaliation for engaging in protected activity under Section 1981.

73.    These actions constitute discrimination under Section 1981.

### COUNT III
### Violations of the Pennsylvania Human Relations Act ("PHRA")
### ([1] Race Discrimination; [2] Hostile Work Environment; [3] Retaliation)
### -Against All Defendants-

74.    The foregoing paragraphs are incorporated herein in their entirety as if set forth in full.

75.    Plaintiff re-asserts and re-alleges each and every allegation as set forth in COUNT I of the instant Civil Action Complaint, as such actions constitute identical violations of the Pennsylvania Human Relations Act.

**WHEREFORE**, Plaintiff prays that this Court enter an Order providing that:

A.    Defendants are to compensate Plaintiff, reimburse Plaintiff and make Plaintiff whole for any and all pay and benefits Plaintiff would have received had it not been for Defendants'

11

illegal actions, including but not limited to past lost earnings, future lost earnings, salary, pay increases, bonuses, medical and other benefits, training, promotions, pension, and seniority. Plaintiff should be accorded those benefits illegally withheld from the date he first suffered retaliation at the hands of Defendants until the date of verdict;

B.      Plaintiff is to be awarded punitive damages, as permitted by applicable law(s) alleged asserted herein, in an amount believed by the Court or trier of fact to be appropriate to punish Defendants for their willful, deliberate, malicious and outrageous conduct and to deter Defendants or other employers from engaging in such misconduct in the future;

C.      Plaintiff is to be accorded any and all other equitable and legal relief as the Court deems just, proper and appropriate including for emotional distress;

D.      Plaintiff is to be awarded the costs and expenses of this action and reasonable legal fees as provided by applicable federal and state law;

E.      Any verdict in favor of Plaintiff is to be molded by the Court to maximize the financial recovery available to Plaintiff in light of the caps on certain damages set forth in applicable federal law; and

F.      Plaintiff's claims are to receive a trial by jury to the extent allowed by applicable law.  Plaintiff has also endorsed this demand on the caption of this Complaint in accordance with Federal Rule of Civil Procedure 38(b).

Respectfully submitted,

**KARPF, KARPF & CERUTTI, P.C.**

By: _____
Ari R. Karpf, Esq. (91538)
8 Interplex Drive, Suite 210
Feasterville-Trevose, PA 19053
215-639-0801 (P)
215-639-4970 (F)
akarpf@karpf-law.com

Dated: March 26, 2026

13